*554 Francis E. Sweeney, Sr., J.
The issues before this court are: (1) whether actual intent by the insurer to refuse to fulfill its contract with the insured is a requisite element of the tort of bad faith as held in Said; and (2) whether R.C. 2315.21(C)(2), requiring the court to set the amount of punitive damages even in jury trials, is violative of the right to trial by jury. For the reasons that follow, we overrule Said and hold that actual intent is not an element of the tort of bad faith. We further hold that R.C. 2315.21(C)(2) violates the right to trial by jury. Accordingly, we reverse the judgment of the court of appeals.
I
Bad Faith
This court must initially determine the proper standard used to decide whether an insurer has breached its duty to its insured to act in good faith. In deciding this issue, it is necessary to revisit our decision in Motorists Mut. Ins. Co. v. Said, supra, 63 Ohio St.3d 690, 590 N.E.2d 1228.
In Said, we held that:
“A cause of action arises for the tort of bad faith when an insurer breaches, its duty of good faith by intentionally refusing to satisfy an insured’s claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal. Intent that caused the failure may be inferred and imputed to the insurer when there is a reckless indifference to facts or proof reasonably available to it in considering the claim.” (Emphasis added.) Id. at paragraph three of the syllabus.
Rather than clarify the standard of proof required in the area of bad faith litigation as the Said decision set out to do, this court has caused greater confusion by erroneously making intent an element of the tort of bad faith.
Until Said, the element of intent had been notably absent from this court’s definition of when an insurer acts in bad faith. In fact, with the exception of Said and the four-to-three decision of Slater v. Motorists Mut. Ins. Co. (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, over the past forty-five years this court has consistently applied the “reasonable justification” standard to bad faith cases. According to this standard, first announced in 1949 in the case of Hart v. Republic Mut. Ins. Co. (1949), 152 Ohio St. 185, 39 O.O. 465, 87 N.E.2d 347, and reaffirmed in Hoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, and Staff Builders, Inc. v. Armstrong (1988), 37 Ohio St.3d 298, 525 N.E.2d 783, “an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.” Id. at 303, 525 *555 N.E.2d at 788. Intent is not and has never been an element of the reasonable justification standard. Hence, in deciding Said, supra, and in relying upon the erroneous Slater decision, this court departed from forty-five years of precedent. By expressly overruling Said and Slater, we will be following the logical progression of case law that has developed over the years.
We reject appellee’s contention that under the doctrine of stare decisis, we must adhere to our decision in Said. The Said decision was an aberration that failed to follow clearly established precedent. As stated in Helvering v. Hallock (1940), 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, 612: “fSJtare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.” In this case, stare decisis dictates that we correct our previous mistakes and reinstate the reasonable justification standard.
Our review of the record indicates the trial court correctly instructed the jury on the law of bad faith using the reasonable justification standard. There was ample evidence to support the jury’s finding that Homestead failed to conduct an adequate investigation and was not reasonably justified in denying Zoppo’s claim.
From the outset, Homestead’s inquiry focused primarily on Zoppo, who claimed that he was in Pennsylvania hunting at the time of the fire. Homestead’s investigators did not seriously explore evidence that other individuals, who were previously ousted from the bar by Zoppo, had threatened to burn the bar down. In fact, there was a previous attempt made to set the bar on fire. Two of the ousted men bragged in public that they were responsible for the attempted fire and one said he would be back “to finish the job.” Following the actual fire, which occurred only three weeks after the attempted arson, one of the ousted men told a group of bar patrons that he had set the fire.
Despite these leads, and despite the fact that there appeared to have been a robbery and break-in (machines were broken into and one of the windows was broken), there was evidence at trial that the Homestead investigators failed to locate certain key suspects, verify alibis, follow up with witnesses or go to Pennsylvania to determine Zoppo’s whereabouts on the morning of the fire. In fact, evidence was presented that when interviewing some of the alleged perpetrators, the investigators did little more than ask cursory questions such as whether they were responsible for the fire. When they answered negatively, their questioning ceased.
The investigators instead focused on the inconsistencies in Zoppo’s statements concerning the sequence of events the morning of the fire and on the statement of a bar patron, Dave Pogue. Pogue initially corroborated the theory that the *556 ousted men were responsible for the fire, but he later implicated Zoppo. However, there was evidence that he was paid for this later statement.
Part of Homestead’s denial of the Claim was based upon its belief that Zoppo had a motive for destroying his building, namely, financial gain. Homestead argued that the bar was overinsured and that it was losing money. However, there was evidence to the contrary. Although Zoppo had purchased the bar six months prior to the fire for $10,000 and had insured it for $50,000, Homestead, in its initial underwriting report, had stated that the building had a market value of $95,798. Furthermore, Zoppo had no debts and had actually made improvements to the bar prior to the fire. Moreover, before the denial of the claim, Zoppo attempted to prevent demolition so that he could rebuild the bar.
Finally, Zoppo’s expert, a claims consultant, testified that the Homestead investigation was inadequate and that Homestead was not justified in denying the claim.
Hence, based on the foregoing, we reinstate the trial court’s finding of bad faith.
II
Damages
The next issue to be addressed is whether R.C. 2315.21(C)(2) violates the right to trial by jury. R.C. 2315.21(C)(2) provides:
“In a tort action, whether the trier of fact is a jury or the court, if the trier of fact determines that any defendant is liable for punitive or exemplary damages, the amount of those damages shall be determined by the court.”
The right to a trial by jury is a fundamental constitutional right which derives from the Magna Carta. Cleveland Ry. Co. v. Halliday (1933), 127 Ohio St. 278, 284, 188 N.E. 1, 3. The right is guaranteed by Section 5, Article I of the Ohio Constitution. Although the constitutional right to a jury trial is not guaranteed in all cases, the right extends to those causes of action where the right existed at common law. Sorrell v. Thevenir (1994), 69 Ohio St.3d 415, 421, 633 N.E.2d 504, 510; Belding v. State ex rel. Heifner (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus.
Thus, in analyzing the validity of R.C. 2315.21(C)(2), we must first determine whether there existed a common-law right for a jury to assess the amount of punitive damages.
The English courts first recognized punitive damages in Wilkes v. Woods (1763), 98 Eng.Rep. 489. Thereafter, as early as 1791, American juries began awarding punitive damages and assessing their amount. Corvell v. Colbaugh (1791), 1 N.J.L. 77. In 1859, the common-law right to have juries award punitive *557 damages was regarded as “settled” in Ohio. Roberts v. Mason (1859), 10 Ohio St. 223, 225. In Roberts, this court emphasized the importance of the jury’s role in determining punitive damages when it stated: “[Tjwelve intelligent and impartial men, acting under oath, and subject, in a proper case, to the control of the court, are not likely to do any great wrong; and it seems to us that the power which this rule confers upon a jury, may, in practice, operate as a salutary restraint upon the evil passions of bad men.” Id.
Prior to the 1987 enactment of R.C. 2315.21(C)(2), 142 Ohio Laws, Part I, 1661, 1691, juries in this state had the integral role of determining not only when punitive damages were justified but also of assessing the amount of such damages. Clearly, the assessment of punitive damages by the jury stems from the common law and is encompassed within the right to trial by jury. However, the legislature, by enacting R.C. 2315.21(C)(2) and by permitting only the court to determine the amount of punitive damages, has in effect abrogated the common-law right of the jury to assess the amount of punitive damages.
It is well settled that the right to trial by jury “ ‘cannot be invaded or violated by either legislative act or judicial order or decree.’ ” Sorrell v. Thevenir, supra, 69 Ohio St.3d at 421, 633 N.E.2d at 510, quoting Gibbs v. Girard (1913), 88 Ohio St. 34, 102 N.E. 299, paragraph two of the syllabus. Since R.C. 2315.21(C)(2) impairs the traditional function of the jury in determining the appropriate amount of damages, we hold that R.C. 2315.21(C)(2) violates the right to trial by jury under Section 5, Article I of the Ohio Constitution.
Finally, in so ruling, we considered but were unpersuaded by appellee’s reliance on Digital & Analog Design Corp. v. N. Supply Co. (1992), 63 Ohio St.3d 657, 590 N.E.2d 737. In Digital, this court held that a litigant does not have a right to trial by jury to determine the amount of attorney fees. The discussion in Digital pertaining to the validity of R.C. 2315.21(C) is merely dicta since, in Digital, the assessment of punitive damages was not at issue. However, we do reject the reasoning espoused in Digital which treats the right to trial by jury in-cases assessing attorney fees the same as the right in cases of punitive damages. Id. at 662-663, 590 N.E.2d at 742-743. We believe the right to have a jury assess punitive damages differs from the right to have a jury assess attorney fees. With punitive damages, the right stems from common law; however, no such right existed at common law for attorney fees.
We must next determine whether there were sufficient facts presented for the jury to consider an award of punitive damages. In Staff Builders, Inc. v. Armstrong (1988), 37 Ohio St.3d 298, 525 N.E.2d 783, paragraph two of the syllabus, we stated that: “Punitive damages may be recovered against an insurer that breaches its duty of good faith in refusing to pay a claim of its insured upon proof of actual malice, fraud or insult on the part of the insurer.” In this case, *558 since Homestead did not act fraudulently in denying Zoppo’s claim, the question becomes whether Homestead acted with actual malice. “Actual malice” is defined as “(1) that state of mind under which a person’s conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.” (Emphasis sic.) Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.
There is no evidence here of hatred, ill will or a spirit of revenge. Thus, the trial court had the obligation to determine that there was sufficient evidence that Homestead consciously disregarded Zoppo’s rights. Id. The record reveals a one-sided inquiry by Homestead investigators as to who was at fault. They did not adequately question suspects or follow up on leads. Homestead breached its affirmative duty to conduct, an adequate investigation. The award of punitive damages was justified.
Finally, regarding the issue of compensatory damages and attorney fees, we hold that an insurer who acts in bad faith is liable for those compensatory damages flowing from the bad faith conduct of the insurer and caused by the insurer’s breach of contract.
However, contrary to appellants’ position, an insured is not automatically entitled to interest or attorney fees. An insured who seeks prejudgment interest must follow the specific statutory procedures set forth in R.C. 1343.03. Attorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted. Columbus Finance, Inc. v. Howard (1975), 42 Ohio St.2d 178, 183, 71 O.O.2d 174, 177, 327 N.E.2d 654, 658.
For the following reasons, we reverse the judgment of the court of appeals on the issues of bad faith and the constitutionality of R.C. 2315.21(C)(2) and reinstate the jury’s finding of punitive damages and attorney fees. We remand this cause to the trial court for a hearing for a jury to determine the amount of punitive damages.

Judgment reversed ■ and cause remanded.

Douglas and Resnick, JJ., concur.
A.W. Sweeney, J., concurs in the syllabus and judgment only.
Pfeifer, J., concurs in part and dissents in part.
Moyer, C.J., and Wright, J., dissent.